**Slip Op. 06-73**

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| | : | |
| **UNITED STATES,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Court No. 02-00646** |
| | : | **Before: Judge Judith M. Barzilay** |
| **OPTREX AMERICA, INC.,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

### MEMORANDUM OPINION AND ORDER

[Defendant's Motion for Partial Summary Judgment is denied.]

Dated: May 17, 2006

*Peter D. Keisler*, Assistant Attorney General; *David M. Cohen*, Director, (*Patricia M. McCarthy*), Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (*Stephen C. Tosini*); *Frederick B. Smith*, Assistant Chief Counsel, Bureau of Customs and Border Protection, of counsel, for the plaintiff.

*Sonnenberg & Anderson* (*Steven P. Sonnenberg*), *M. Jason Cunningham*, of counsel, for the defendant.

Barzilay, Judge: In this 19 U.S.C. § 1592 penalty action based on a claim of negligence, discovery has been completed, and Defendant, Optrex America, Inc. ("Optrex"), moves pursuant to USCIT Rule 56 for partial summary judgment against Plaintiff, United States (specifically, the United States Bureau of Customs and Border Protection) ("Customs" or "government"). Arguing that there are no genuine issues of material fact, Optrex claims that it is entitled to a judgment as a matter of law on the issue of its exercise of reasonable care in

classifying subject merchandise. Customs counters that summary judgment is not appropriate because there are issues of material fact with respect to Optrex's exercise of reasonable care. Pursuant to USCIT Rule 56(h), Optrex filed its *Statement of Material Facts As to Which There Are No Genuine Issues to Be Tried* ("Optrex Statement of Facts"), and the government filed its *Counterstatement of Material Fact* [sic] ("Gov't Statement of Facts"). The court has exclusive jurisdiction over this matter pursuant to 28 U.S.C. § 1582, which provides for judicial review of civil penalties assessed under 19 U.S.C. §1592. Because there remain genuine issues of material fact, Defendant's motion is denied.

### BACKGROUND FACTS AND PROCEDURAL HISTORY

The government initiated this action in October 2002, claiming that between October 12, 1997, and June 29, 1999, Optrex introduced into the commerce of the United States certain liquid crystal display ("LCD") articles by means of negligent material false statements in violation of 19 U.S.C. § 1592. Specifically, Plaintiff claims that the LCD articles at issue[1] were negligently

---

[1] The government avers that the subject articles in this action consist of LCD *panels*. Gov't Statement of Facts ¶ 18 (stating that only LCD panels are at issue in this case); *see* Pl.'s Resp. 3 (stating that "this case primarily involves LCD *panels*). In its response brief in opposition to Defendant's summary judgment, the government, however, seems to admit that there is also a very small number of LCD character modules involved in this case. *See* Pl.'s Resp. 24. Either side has yet to delineate which LCD products are precisely involved.

It should be noted that initially Customs' complaint included LCD modules classifiable under heading 8531, HTSUS; the government later amended its complaint to correct for clerical mistakes and to exclude graphic LCD modules. *See* Def.'s Reply 13; Am. Compl.; 2nd Am. Compl. According to Optrex's chief engineer, Mr. Houck, LCD panels – also known as glass sandwiches, glass panels or LCD glass panels – consist of two layers of glass, have no on-board drivers, and function only by receiving codes from a computing unit. *See, e.g.*, Houck Dep. 17:2-10, Jan. 14, 2004. LCD modules, on the other hand, are equipped with on-board electronic drivers. *See* Houck Dep. 23:24-15 (testifying that "the addition of some sort of row or column driver" makes "an LCD module distinct from an LCD panel.").

misclassified under heading 8531, Harmonized Tariff Schedule of the Untied States ("HTSUS"),

instead of heading 9013, HTSUS, in violation of the Federal Circuit's decision in *Sharp*

*Microelecs. Tech., Inc. v. United States*, 122 F.3d 1446 (Fed. Cir. 1997). *See* Compl. ¶¶ 10-12

The parties do not dispute that as entered, the subject LCDs were classified under heading 8531,

HTSUS. Optrex Statement of Facts ¶ 19; Gov't Statement of Facts ¶ 19.

Customs' investigation into Optrex's classification of imported LCDs commenced in

June 1998. Gov't Statement of Facts ¶ 16. After notifying Optrex of the investigation in April

1999, Customs began to review Optrex's import practices by interviewing employees and

analyzing entry documents. Optrex Statement of Facts ¶¶ 30-34. During the investigation,

Optrex's counsel maintained that Optrex had administered its import program properly and

acknowledged that although Customs' review may show some areas of noncompliance, it also

illustrated that Optrex overpaid duties to U.S. Customs for past entries. *Letter to Darrel E.*

*Woodard*, Nov. 3, 1999. Subsequently, Optrex provided Customs with a "decision tree"

purporting to show the classification method Optrex used during the time period under review.

*Letter to Frank Corace*, Nov. 24, 1999, Def.'s S.J. Mem. Ex. B ("November 1999 letter").

Pursuant to 19 U.S.C. § 1592(b)(A)(i)-(vii), Customs issued a pre-penalty notice in May

2002, which alleged that Optrex's negligence resulted in a violation of section 1592 and claimed

a $ 2,033,562.10 loss of revenue. Customs demanded a monetary penalty of $ 4,067,124.20.

Def.'s S.J. Mem. Ex. I. The pre-penalty notice charged Optrex with providing insufficient

information in the entry documents to enable Customs to determine the correct classification,

charging as follows: "During the period July 1997 through June 1999, Optrex . . . filed 991

entries for merchandise that included LCD panels and components subject to classification in heading 9013, HTSUS. At the time of entry, the LCD panels and components were classified in HTSUS 8531 on the entry documents submitted to Customs." Def.'s S.J. Mem. Ex. I.. In response to the pre–penalty notice, Optrex claimed that it had exercised reasonable care by consulting its counsel, its broker, and Customs about the correct classification of its products. Hr'g Ex.[2] H10 at 7. Customs rejected Optrex's reasonable care defense on the basis "that reliance on a broker or exporter alone may not be sufficient to show that an importer exercised reasonable care." Hr'g Ex. H12 at 5 (citing *United States v. Golden Ship Trading Co.*, 25 CIT 40, (2001) (not reported in F. Supp. 2d)).

As a result of discovery in this litigation, the government claims that it unearthed documentary evidence (specifically, attorney-client communications), demonstrating that Optrex disregarded continuous advice of counsel to correctly classify the subject entries under heading 9013, HTSUS, and that Optrex "contemporaneously kept a separate account on its books and records reflecting the higher (correct duty rate) despite the fact that Optrex chose to pay the (incorrect) lower duty rate in contravention of counsel's express advice" – evidencing that Optrex knew how to correctly classify LCD products. Pl.'s Resp. 6. Before the close of discovery in this matter, Plaintiff deposed Optrex's present employees, Ms. Marsh, Mr. Houck,

---

[2] The court held an evidentiary hearing on February 17, 2005, regarding the government's allegation that it discovered new evidence to pursue a fraud claim. The court denied Plaintiff's motion to amend its complaint to add two additional claims, fraud and gross negligence, based on a statutory interpretation of 19 U.S.C. § 1592. *See United States v. Optrex Am., Inc.*, Slip Op. 05-160, 2005 WL 3447611 (CIT Dec. 15, 2005).

At the court's hearing on February 17, 2005, the court admitted certain exhibits into evidence. Those exhibits are cited to as "Hr'g Ex." followed by a number.

and Ms. Tolbert, and former Optrex employee Ms. Terese Banas. Gov't Statement of Facts ¶ 42.

The government's claim of negligence centers around three letters from Optrex's counsel to

Optrex and relevant deposition testimony.

A. *The October 1997 Letter*

In a October 1997 letter, Optrex's counsel advised Optrex to follow *Sharp*, 122 F.3d

1446, a classification case holding that certain LCD glass panels should be classified under

HTSUS 9013. Hr'g Ex. H1 at 4. The letter stated that "the *Sharp* decision may have an impact

on the manner in which certain LCD displays imported by Optrex are classified," emphasized

that it was Optrex's "responsibility to determine the proper tariff classification of merchandise

which it imports," and recommended that Optrex review its product line to ensure it did not

include any "glass only" LCD panels. Hr'g Ex. H1 at 1. Based on the *Sharp* decision, Optrex's

counsel saw a strong argument that such "LCD glass panels are properly classifiable within tariff

subheading 9013" and advised Optrex to "immediately begin classifying any such LCD glass

panels within . . . 9013." Hr'g Ex. H1 at 1. Counsel also advised Optrex to seek a binding ruling

from Customs to determine whether *Sharp* affected all types of "glass only" panels. Hr'g Ex. H1

at 1. The government avers that this October 1997 letter demonstrates that Optrex disregarded

the continuous advice of its counsel to correctly classify the subject entries under heading 9013,

HTSUS.

B. *The February 1999 Letter*

In a February 1999 letter, Optrex's counsel inquires whether "the accrual rate . . . relate[s]

to the classification of imported merchandise." Hr'g Ex. H2 at 1. The government claims that

this letter demonstrates that "Optrex maintained an 'import accrual' in 1997 and 1998, based upon the correct rate of duty, HTS 9013, for the subject merchandise." Pl.'s Resp. 6 (citing Hr'g Ex. H2).

C.  *The May 1999 Letter*

In a third letter, dated one month after Customs notified Optrex that it was under investigation, counsel provided Optrex with "the decision tree." Hr'g Ex. H3 at 1. According to Optrex's counsel, the decision tree would "provide Optrex the most favorable method of classifying products" and was "intended to satisfy both Customs and Optrex in the pursuit of proper classification." Hr'g Ex. H3 at 1. The government argues that the "decision tree" was specifically created "to satisfy Customs" and supports this position by arguing that the tree presents a classification scheme different from the one outlined in the October 1997 letter.[3] Because the October 1997 letter advised Optrex to consider the implications of the *Sharp*

---

[3]The October 1997 letter included a summary of how counsel at that time believed Optrex classified its products based on a six-paragraph classification scheme developed by counsel and Customs in 1995. Hr'g Ex. H1 at 2. According to the first paragraph, LCD panels and modules dedicated to a specific use fell under HTSUS 8531. Hr'g Ex. H1 at 2. The second paragraph stated that modules and panels with less than 80 lines were classifiable under HTSUS 8531. Hr'g Ex. H1 at 2. Paragraphs 3-5 dealt with specific Customs rulings, and the last paragraph advised that all other panels and modules should be classified under HTSUS 9013. Hr'g Ex. H1 at 2.

According to counsel, the decision tree consists of three levels. The first contains duty free products classifiable under HTSUS 8471 and 8473. (Products classifiable under Level I are not at issue in this case.) The second level includes "electric sound or visual signaling apparatus" classifiable under HTSUS 8531. Hr'g Ex. H3 at 1-2. The diagram for the second level specifies four subheadings of HTSUS 8531 accompanied with examples. It includes subheading 8531.20.00 covering "LCD's [sic] with 80 characters or less." Hr'g Ex. H3. Counsel noted that "Level II products include the subheadings which Optrex is already utilizing for classification purposes." Hr'g Ex. H3. All other products, primarily glass panels that could "not be classified elsewhere, fell within Level III and corresponded to various higher duty rates under HTSUS 9013." Hr'g Ex. H3 at 2.

decision, while reaffirming its earlier classification advice given in 1995, and the decision tree

was "created" in May 1999, the government believes that Optrex knowingly misrepresented to

Customs that since 1994 it followed a classification methodology contained in the "decision

tree." *See* Pl.'s Resp. 9.

The government's disagreement with Defendant's *Statement of Material Facts As to*

*Which There Are No Genuine Issues to Be Tried* is best presented by quoting in pertinent part the

paragraphs of the government's counterstatement:

> 37.  *Optrex cooperated with Customs* [sic] *underlying penalty investigation by providing access to its files and personnel.*[4]
> We dispute this proposed factual finding. Optrex impeded the investigation as long as possible by misleading investigators and failing to turn over records sought by the summons. As an example, for months, Optrex represented to Customs that Mr. Houck was the expert on classification. It was not until the March 18, 2002 interview with investigating agents that the we [sic] learned that he had no knowledge of classification matters.  [Houck Dep. at 3-5.]
> . . . .
> 44.  *Optrex provided information sufficient for Customs to determine classification of the subject articles.*
> We dispute the proposed finding. Optrex stalled and refused to cooperate in the investigation until threatened with civil enforcement litigation before finally providing substantive compliance to the Customs summons. . . .
>
> 45. *Customs Port of Detroit created a "shipper file" with information relevant to the classification of Optrex's imported LCD's* [sic].
> Import Specialist Frank Corace testified about these records at the evidentiary hearing upon our motion to amend. [Hr'g Tr. at 44-45.]  The "shipper file" itself provides the best evidence of its contents, and Mr. Corace's testimony provides the best evidence of his use of the Optrex "shipper file." Thus, we dispute this proposed finding.
>
> 46. *The information contained in the shipper file was sufficient for Customs to determine whether classification of imported LCD's* [sic] *was*

---

[4]Each paragraph in the government's counterstatement of facts begins with quoting of Defendant's averments, which are italicized for the reader's convenience.

*correct.*

We dispute the proposed finding. Optrex imported a wide variety of products. Some of these products were new and the information in the shipper file was dated. Only in a limited number of cases was this shipper file information sufficient to ascertain the proper classification. *See generally* Corace Dec. [sic] at ¶¶ 1-6.

47. *Before the underlying investigation began, Optrex had provided Customs with Optrex's LCD product catalog.*

We dispute this proposed finding as it implies that the catalog was a "current" catalog. Instead, the catalog reflected Optrex's product line as of 1995, which was well before the entries relevant to this case were made.

48. *LCD product catalogs are relevant to the classification of LCD's* [sic].

We dispute this proposed finding because it is a legal conclusion which requires no response. Moreover, Optrex does not claim that the specific 1995 catalog that it provided was relevant to the classification of its 1997 through 1999 entries of LCD panels that are at issue in this case.

49. *Before the underlying investigation began, Optrex had provided Customs with Optrex's LCD part number key.*

We dispute this proposed finding as much of the part number key was dated and not reflective of the full universe of products. In addition, not all fields were complete on the list. Accordingly, we dispute this proposed finding. Moreover, Optrex does not certify the completeness of its number key. *See generally* Corace Dec. [sic] at ¶¶ 1-6.

50. *Optrex's LCD part number key is relevant to the classification of the subject LCD's* [sic].

We dispute this proposed finding because it is a legal conclusion which requires no response.

. . . .

53. *Optrex furnished information sufficient to permit Customs to determine the final classification of the subject LCD's* [sic].

We dispute this proposed finding because it is a legal conclusion which requires no response. Moreover, Optrex does not address when or how it allegedly provided information concerning classification of the subject LCD panels. Indeed, Optrex admits by omission that the entry documents that it submitted to Customs were insufficient to determine the classification of the subject LCD panels.

54. *Optrex consulted with its licensed customs broker regarding the*

*classification and entry of the subject articles.*

We dispute this finding because the only evidence in this case demonstrated that this statement is patently inaccurate. Specifically, Ann Fitzpatrick, the manager of administration and accounting for Nippon Express in Detroit, Fitzpatrick Dep. at 16:17-18 (available at Tosini Decl. at Ex. 4), made clear that Optrex never sought Nippon Express' advice and that Optrex had directed Nippon Express to classify Optrex's LCD panels under HTS Ch. 8531. Specifically, when asked "how often would Optrex personnel come to you for advice on the property clarification concerning LCD modules and panels?," Ms. Fitzpatrick answered: "They wouldn't." Id. at 48:24-49:2; *see also* id. at 49:14-50:23 and at Ex. 2 (testimony and Optrex documents that Optrex provided Nippon Express with the HTS codes to be used for Optrex's LCDs); id. at 53 (establishing that the employees supervised by Ms. Fitzpatrick did not meet independently with Optrex with respect to classification of LCDs); id. at 55:23-56:4 (testifying that she did not provide LCD classification advice to Optrex); id. at 66:18-67:7 ("just want to clarify that Optrex is a different -- than our other clients. Like I said, as far as classification we -- I never advised them on their LCD not knowing what the merchandise is. But as far as other classifications, like I said, if they received books, pamphlets, something out of the ordinary, we would discuss the classification. Q. And why wouldn't you advise them concerning classification of LCD products? A. Because I have -- I know they're very complex as far as their nature, they're programmed or not programmed, or something about how many characters, or their application, and I have no knowledge as to what they do with their -- you know, how that's applied to their merchandise").

Ms. Fitzpatrick also testified that she was not provided with Optrex's so-called decision tree until 1999 or 2000, id. at 62 and at Ex. 10 thereto, and that neither Optrex nor Optrex's counsel sought her advice concerning the so-called decision tree. Id. at 64:4-12.

55. *Optrex consulted with Customs attorneys regarding the classification and entry of the subject articles.*

We agree that "Optrex consulted with Customs attorneys regarding the classification and entry of the subject articles." However, Optrex disregarded the advice that it was given and then took affirmative steps to cover up this fact during Customs' investigation and Court proceedings. Specifically, counsel explicitly advised Optrex to classify glass panel displays -- the subject merchandise in this case -- under HTS 9013. Exs. H-24; H-1 at 2,4; and H-2. The new information also revealed that Optrex contemporaneously kept a separate account on its books and records reflecting the higher (correct duty rate) despite the fact that Optrex chose to pay the (incorrect) lower duty rate in contravention of counsel's express advice. Specifically, a February 17, 1999, letter from counsel

reveals that Optrex maintained an "import accrual" in 1997 and 1998, based upon the correct rate of duty, HTS 9013, for the subject merchandise. Ex. H-2. The only testimony of any Optrex employee involved in the classification of the LCD panels subject to this action further demonstrates that Optrex based its import accrual upon the known correct rate of duty for its merchandise:

> Q: So what Optrex did . . . was it told Customs when it classified the merchandise coming in that it was classifiable at the lower rate, however, it set aside the amount of duties that would be owed if it were paying the higher rate into a separate account . . . [f]or specific products?
> A: Yep.
> Q: And those specific products were LCD displays?
> A: That's all we did, that's what was imported for Optrex, was LCD displays.

Banas Dep.[5] at 80:7-21 (available at Tosini Dec. [sic] at Ex. 3).

> Q: Why didn't Optrex just import the merchandise under the higher code if it believed that that was the duties that would be owed?
> A: That was not my decision to do that. That was the decision of the president of the company and the sales director at the time.

Id. at 81:6-11.

> Q: . . . You stated that the effect of the rate of the import accrual was really to govern what the parent company would see about the subsidiary's profits and losses, right?
> A: Yes.

Id. at 95:18:22.

Likewise, Optrex affirmatively concealed its knowledge that the subject entries should have been classified under HTS 9013, throughout the investigation and this case.

> 56. *Optrex sought guidance from the Customs service by submitting a detailed classification process letter to Import Specialist Frank Corace in November of 1999.*

We dispute this proposed finding as this was not the purpose of this document. Optrex is referring to the decision tree it created in response to the investigation underlying this litigation. . . . The entries had already been filed by the time this document was created. The letter was an effort to respond to the investigation - not to seek Customs' guidance. Accordingly, we dispute the proposed finding and it should be disregarded.

---

[5]Ms. Banas is a former Optrex employee, who during the relevant time period (1997-1998) had supervisory responsibility for Optrex's accounting personnel and operations. Banas Dep. 19:1-13.

57. *Optrex consulted engineer Allen Houck for technical information related to the classification of the subject LCD's* [sic].

We dispute this proposed finding as it implies that Mr. Houck had some knowledge of classification matters when he did not. [Referring to response to no. 59]. Accordingly, we dispute this proposed finding and it should be rejected.

. . . .

59. *Optrex relied upon the specialized technical knowledge of in-house experts, including engineer Allen Houck, regarding classification of the subject articles.*

We dispute this finding because the only evidence in this case demonstrates that this statement is inaccurate. The only employee identified in this proposed finding testified that he had no involvement in the creation of the so-called decision tree and had no knowledge of how a classification decision would be made using that document:

Q: What, if any, involvement did you have in the creation of this decision tree?

A: I didn't have any involvement in the creation of this.

Q: Do you know how a classification decision here at Optrex is made utilizing this decision tree as depicted in Exhibit 6 before you?

A: No, I don't.

Houck Dep. at 14:5-11.

60. *Optrex created a classification decision tree for imported LCD's* [sic].

We dispute this proposed finding because the decision tree is a self-serving document created after the entries at issue in this case were filed for the purpose of creating a facade of compliance with Optrex's reasonable care responsibilities. . . .

63. *Customs provided Optrex with no written response to Optrex's decision tree as provided in the letter of November 1999.*

We dispute this proposed finding. At the hearing, we demonstrated that Customs responded [sic] Optrex's letter of November 1999 with a number of summons' [sic] and written requests for information substantiating whether Optrex actually followed its so-called "decision tree." *See, e.g.*, Ex. H-5 (summonses issued to Optrex); Ex. H-8 (letter from Customs to Optrex of November 2, 2001, requesting information concerning Optrex's so-called "decision tree").

. . . .

67. *Customs 2001 informed compliance publication regarding the classification of LCD's* [sic] *was modified by the agency in 2004.*

We dispute this proposed finding since the publications are the best evidence of its contents. Accordingly, we dispute the proposed finding and it

should be disregarded.

. . . .

> 69. *Optrex formulated and applied an LCD classification process that recognized that LCD's* [sic] *are prima facie classifiable under HTSUS chapters 84, 85, and 90.*
>
> We dispute this proposed finding because it is contradicted by the evidence of this case and there is absolutely no evidence to support this proposed finding. [Referring to responses to nos. 54, 55, 57, and 59.] Accordingly, we dispute the proposed finding and it should be disregarded.

Gov't Statement of Facts ¶¶ 37, 44, 45, 46, 47, 48, 49, 50, 53, 54, 55, 56, 57, 59, 60, 63, 67, 69.

In its motion for partial summary judgment, Optrex asserts that there are two parts to a 19 U.S.C. § 1592 action based on negligence: 1) the Government's proof of an action or inaction and 2) a determination of the level of culpability. *See* Def.'s S.J. Br. 9. When Optrex filed its motion for partial summary judgment, it maintained that the first part was not appropriate for summary judgment because in a parallel classification case, the Court had not yet decided the proper classification of products at issue. *See Optrex Am., Inc. v. United States*, Court. No. 00-08-00382. Since Optrex filed the pending motion, the Court has adjudicated that classification case, finding for the government on all issues of classification of the subject merchandise. *See Optrex Am., Inc. v. United States*, Slip Op. 06-26, 2006 WL 473896 (CIT Feb. 27, 2006), *appeal docketed*, No. 2006-1375 (Fed. Cir. May 2, 2006). There are no arguments before the court that the outcome in the classification case has an effect on the present case. Regardless, Plaintiff correctly observes that Defendant essentially seeks summary judgment because the exercise of reasonable care is a complete defense to this action, as explained below. *See* Pl.'s Resp. 17 n.4.

## I.  STANDARD OF REVIEW AND SUMMARY JUDGMENT

Summary judgment is appropriate when "there is no *genuine* issue as to any *material* fact and . . . the moving party is entitled to a judgment as a matter of law."  USCIT R. 56(c) (emphasis added); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)) (summary judgment is appropriate "if the pleadings [and the discovery materials] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.")  "[I]f the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment will not be awarded.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.*  The court must view the evidence, draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 259 (internal citation omitted).  Accordingly, "a court has an independent obligation to determine, on the basis of parties' submissions, whether a movant is entitled to judgment as a matter of law."  *United States v. T.J. Manalo, Inc.*, 26 CIT 1117, 1119, 240 F. Supp. 2d 1255, 1257 (2002).  "[T]he party opposing summary judgment does not have the burden of showing that there is a genuine issue for trial until the movant has produced evidentiary material showing that there is no genuine issue as to any material fact and he is

entitled to judgment as a matter of law." 2361 *State Corp. v. Sealy, Inc.*, 402 F.2d 370, 375 (7th Cir. 1968).

If summary judgment cannot be rendered upon the whole case, partial summary judgment may be granted in some circumstances. *See* USCIT R. 56(d). "Partial summary judgment is appropriate 'when it appears that some aspects of a claim are not genuinely controvertible [and] . . . genuine issues remain regarding the rest of the claim.'" *Ugg Int'l, Inc. v. United States*, 17 CIT 79, 83, 813 F.Supp. 848, 852 (1993) (ellipsis in original).

In actions brought by the United States to recover monetary penalties "all issues, including the amount of the penalty, shall be tried de novo." 19 U.S.C. § 1592(e)(1) (2000).

## II. DISCUSSION

### A. Negligence and the Defense of Reasonable Care

Section 1592 provides that "no person through fraud, gross negligence, or negligence may enter, introduce, or attempt to enter or introduce any merchandise into the United States by means of a material false document or statement, or a material omission." *United States v. Jac Natori Co.*, 108 F.3d 295, 298 (Fed. Cir. 1997) (citing 19 U.S.C. § 1592(a)). The Department of Justice can bring a "civil penalty" action pursuant to 19 U.S.C. § 1592(e) to recover a penalty claim it sought on the administrative level. *United States v. Optrex Am., Inc.*, Slip Op. 05-160, 2005 WL 3447611, at *7 (CIT Dec. 15, 2005); *see* 19 U.S.C. § 1592 (2000). When the monetary claim brought by the government is based on negligence, "the United States shall have the burden of proof to establish the act or omission constituting the violation, and the alleged violator shall have the burden of proof that the act or omission did not occur as a result of

negligence."  19 U.S.C. § 1592(e)(4).  Thus, section 1592(e)(4) "derogates from common law

negligence (*i.e.*, duty, breach, causation, and injury) by shifting the burden of persuasion to the

defendant to show lack of negligence." *United States v. Ford Motor Co.*, 29 CIT ___, ___, 395 F.

Supp. 2d 1190, 1208 (2005)*.*  In particular, Customs defines negligence as a violation that

> results from an act or acts (of commission or omission) done through either the
> failure to exercise the degree of reasonable care and competence expected from a
> person in the same circumstances either: (a) in ascertaining the facts or in drawing
> inferences therefrom, in ascertaining the offender's obligations under the statute;
> or (b) in communicating information in a manner so that it may be understood by
> the recipient. As a general rule, a violation is negligent if it results from failure to
> exercise reasonable care and competence: (a) to ensure that statements made and
> information provided in connection with the importation of merchandise are
> complete and accurate; or (b) to perform any material act required by statute or
> regulation.

19 C.F.R. Pt. 171, App. B(C)(1) (2005); *see* H.R. Rep. No. 103-361(I) (1993) (stating same).

Thus, the court does not have to find scienter in a negligence case.  *See Ford Motor*, 395 F. Supp.

2d at 1208; *United States v. Hitachi Am., Ltd.*, 21 CIT 373, 380, 964 F. Supp. 344, 355-56

(1997), *aff'd in part*, *rev'd in part on another grounds*, 172 F.3d 1319 (Fed. Cir. 1999) (quoting

19 C.F.R. Pt. 171, App. B(B)(1) with approval).

To meet its burden of proof, "Customs must establish by a preponderance of the evidence

that the materially false act or omission occurred." *Ford Motor*, 395 F. Supp 2d at 1208; *see also*

*United States v. Washington Int'l Ins. Co.*, 29 CIT ___, ___, 374 F. Supp. 2d 1265, 1270, 1275

(2005).  "A preponderance of the evidence is . . . [e]vidence which is . . . more convincing than

the evidence . . . offered in opposition to it . . . ."[6] *Greenwich Collieries v. Director, OWCP*, 990

---

[6]"Unlike other standards of proof such as reasonable doubt or clear and convincing
evidence, the preponderance standard 'allows both parties to share the risk of error in roughly
equal fashion,' except that 'when the evidence is evenly balanced, the [party with the burden of

F.2d 730, 736 (3d Cir. 1993), *aff'd*, 512 U.S. 267 (1994).  The importer then bears the burden of

showing that it did not act negligently.  Limited case law explicates how this shift of burden

operates and what the alleged violator must establish to disprove negligence as a legal

conclusion.  *See, e.g.*, *Ford Motor*, 395 F. Supp 2d at 1208; *United States v. Rockwell Int'l Corp.*,

10 CIT 38, 43 n.5, 628 F. Supp. 206, 211 n.5 (1986).  For the purposes of administrative

proceedings, Customs' guidelines provide how an importer can demonstrate that it did not act

negligently – by showing that it acted with "reasonable care":[7]

> Reasonable Care. General Standard: All parties, including importers of record or
> their agents, are required to exercise reasonable care in fulfilling their
> responsibilities involving entry of merchandise. These responsibilities include, but
> are not limited to: providing a classification and value for the merchandise;
> furnishing information sufficient to permit Customs to determine the final
> classification and valuation of merchandise; taking measures that will lead to and
> assure the preparation of accurate documentation, and determining whether any
> applicable requirements of law with respect to these issues are met. In addition, all
> parties, including the importer, must use reasonable care to provide accurate
> information or documentation to enable Customs to determine if the merchandise
> may be released. Customs may consider an importer's failure to follow a binding
> Customs ruling a lack of reasonable care. In addition, unreasonable classification
> will be considered a lack of reasonable care (e.g., imported snow skis are
> classified as water skis). Failure to exercise reasonable care in connection with the
> importation of merchandise may result in imposition of a section 592 penalty for
> fraud, gross negligence or negligence.

19 C.F.R. Pt. 171, App. B(D)(6).  The drafting committee of the Mod Act noted its expectations

---

persuasion] must lose.'"  *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, __, 117 S. Ct. 1953,
1963 n.9 (1997) (internal citations omitted).

[7] The "reasonable care" requirement was added to 19 U.S.C. § 1484, which governs
importers' obligations with respect to entry of merchandise, by the Customs Modernization and
Informed Compliance Act ("Mod Act"), passed as part of the North American Free Trade
Agreements Implementation Act, Pub. L. 103-182 § 637, Sect. 621, 107 Stat. 2057 (1993).
Customs then extended this concept of reasonable care to penalty cases.

about an importer's actions in fulfilling its burden of reasonable care:

> In meeting the "reasonable care" standard, the Committee believes that an importer should consider utilization of one or more of the following aids to establish evidence of proper compliance: seeking guidance from the Customs Service through the pre-importation or formal ruling program; consulting with a customs broker, a customs consultant, or a public accountant or an attorney; or using in-house employees such as counsel, a customs administrator, or if valuation is an issue, a corporate controller, who have experience and knowledge of customs laws, regulations and procedures[8]. . . .

H. Rep. No. 103-361 at 120, 1993 U.S.C.C.A.N. 2670 (1993).

This Court has adopted Customs' guidance in evaluating whether the alleged violator meets its burden of proof that it did not act with negligence. *See United States v. Pan Pac. Textile Group, Inc.*, 29 CIT ___, ___, 395 F. Supp. 2d 1244, 1255 n.19 (2005) (stating that whether importer was negligent turns on whether it exercised reasonable case, and citing to 19 C.F.R. Pt. 171, App. B(C)(1)); *Ford Motor*, 395 F. Supp. 2d at 1208 (citing to 19 C.F.R. pt. 171, App. B(B)(1) for the definition of negligence, stating that defendant bears burden of showing that it "exercised reasonable care under the circumstances and that the alleged violation was not caused by its negligence," and concluding that "negligence does not require the trier of fact to determine intent"). Importantly, the defense of reasonable care operates as a complete defense to

---

[8]The drafting committee of the Mod Act stated that
The following are two examples of how the reasonable care standard should be interpreted by Customs: (a) the failure to follow a binding ruling is a lack of reasonable care; and (b) an honest, good faith professional disagreement as to correct classification of a technical matter shall not be lack of reasonable care unless such disagreement has no reasonable basis (e.g. snow skis are entered as water skis).
H.R. Rep. No. 103-361 at 120.

a negligence claim. *See Ford Motor*, 395 F. Supp 2d at 1208-09 (finding negligence where importer failed to declare assists on its entry documents or thereafter and failed to declare that values stated in entry documents were not final); *United States v. Yuchius Morality Co.*, 26 CIT 1224, 1231 (2002) (not reported in F. Supp.) (finding negligence where importer lacked record keeping and showed no effort to fully and accurately account for relevant transactions); *United States v. Golden Ship Trading Co.*, 25 CIT 40, 47-48 (2001) (not reported in F. Supp.) (finding negligence where importer failed to exercise reasonable care even though she demonstrated that she relied on information provided by exporter and licensed customshouse broker because she did not even attempt to verify or ascertain correctness of information contained in entry documents regarding merchandise's country of origin as it was supplied by exporter and provided by broker).

### B. Issues of Material Fact As to Optrex's Reasonable Care Arguments

Optrex's defense is premised on Customs' guidelines on the standard of reasonable care. In particular, Optrex argues 1) that it consulted with Customs professionals, 2) that it cooperated with Customs in the underlying administrative proceedings, 3) that it attempted to comply with Customs laws while Customs failed to furnish Optrex with adequate guidelines on classifying the subject merchandise, 4) that its classification policies reflect Optrex's professional disagreement with Customs, and 5) that Optrex followed its decision tree created in good faith to comply with Customs laws and regulations. In deciding whether Optrex met its burden in establishing that it exercised reasonable care, the court will evaluate the evidence in connection with each of Optrex's arguments.

*1. Optrex's Claim That It Consulted with Customs Professionals*

Optrex claims that it exercised reasonable care in classifying the subject LCDs because it consulted with customs professionals including a licensed customs broker, in-house technical experts, and legal counsel. Def's Mem. 13 (citing Banas Dep. 25-26, 36). The court, at this point, cannot rule on this issue on summary judgment because each party has put forth sufficient evidence to place it in dispute. Specifically, Ms. Banas, as one of the personnel responsible for final classification of the company's products, testified that she consulted with Nippon Express regarding classification of the company's products. *See* Banas Dep. 36. However, controverting evidence raises issues as to whether Optrex consulted its Customs broker. *See* Fitzpatrick Dep. 48:24-49:2, Dec. 10, 2003 (testifying that Optrex did not seek advice regarding classification of its LCD products from Nippon Express,[9] the only Customs Broker Optrex indicated that it had used in response to Customs' questionnaire); Fitzpatrick Dep. 64 (testifying that she did not see the decision tree until 1999). Because of this inconsistent testimony, the court cannot conclude summarily that Defendant's evidence outweighs Plaintiff's evidence. In such cases, credibility of testimony is best tested through the method of cross-examination.[10]

---

[9] In its reply brief, Defendant offered another piece of evidence – a letter Nippon Express wrote to Optrex's predecessor, Asahi Glass, dated August 1991, stating that tariff under heading 8531 is the correct tariff. *See* Def's Reply Br. Ex. H. The relevance of this evidence to the time period in this case is tenuous.

[10] Personal examination at trial "(1) insures that the witness will give his statements under oath - thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'; [and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility." *Maryland v. Craig*, 497 U.S. 836, 845-46 (1990) (quoting *California v. Green*, 399 U.S. 149, 158 (1970) (footnote & quotations omitted)

Optrex's claim that it relied on the knowledge of its in-house experts is vitiated by the testimony of Mr. Houck, one of its experts, who testified that he was neither involved in the creation of the decision tree, nor was aware of its application. Houck Dep. 14:5-11, Jan. 14, 2004. In addition, aside from a naked assertion that its "in-house personnel reviewed the relevant technical drawings, specification, and sales information," Def. S.J. Mem. 20, Optrex did not provide other evidentiary support.[11] *See Int'l Longshoremen's Ass'n v. Davis*, 476 U.S. 380, 398 (1986) (stating that in moving for summary judgment, or for directed verdict, appellant failed to point to any evidence to support its claim).

The record indicates that Optrex did in fact seek and receive classification advice from its

---

(brackets in original)).

[11] Unsupported statements of fact are not sufficient to meet the movant's burden on a motion for summary judgment. *See, e.g., Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888-89 (1990); *Anderson*, 477 U.S. at 249 (Movant cannot rest on his allegations to win summary judgment "without 'any significant probaitve evidence tending to support'" his case.) (citation omitted). It should be noted that USCIT Rule 56(e) requires the movant to support its assertions with admissible evidence and, therefore, lay out foundation for each piece of evidence. *See* USCIT R. 56(e)

> Supporting and opposing affidavits [in support of motion for summary judgment] shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. . . . The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

USCIT R. 56(e).

Customs attorney. *See, e.g.*, Hr'g Exs. H1, H2, H3. The government does not dispute this fact, but instead argues that what was required of Optrex "at the very least is [to] actually follow its attorney's advice." Pl.'s Resp. 20. Optrex claims that it followed its attorney's advice pointing to the decision tree.[12] *See* Def.'s Reply 10. Aside from the decision tree, Optrex does not present other evidence to buttress its assertion. However, the decision tree alone is not a highly probative piece of evidence because it was prepared during the administrative investigation and, therefore, arguably in response to Customs' investigation. *See* Hr'g Ex. 3 (counsel informing Optrex that "the 'decision tree' is intended to satisfy both Customs and Optrex in the pursuit of proper classification"). In addition, the Mod Act's legislative history is neither talismanic of what constitutes exercise of reasonable case; nor is consulting a Customs professional a safe harbor for importers. Rather, the Mod Act suggests means of establishing evidence of reasonable care. Thus, consultation with an attorney is *evidence* of compliance; it is not compliance in itself.

---

[12] It should be noted that the government effectively highlights that in its Statement of Facts, Optrex claimed to have merely "consulted" with its licensed Customs broker and legal counsel regarding the classification and entry of the subject merchandise and that Optrex "relied" on the "specialized technical knowledge of in-house experts, including engineer Allen Houck." Optrex Statement of Facts ¶¶ 54-55, 59. Although Optrex's word choices are noteworthy, they have no probative value. In other words, "consulting" does not mean that Optrex did not attempt to comply with attorney's advice.

In its reply brief, citing to a document admitted into evidence at the February 17, 2005, hearing, Optrex stated that it believed that "the advice from counsel did not necessarily require classification under Heading 9013 or 8531, but might be more appropriate under Chapter 84 as a part of an automatic data processing machine. The document states,

> Our attorney Sonnenberg thinks we have good grounds to make an argument with Customs to keep the reclassified parts in question in a 2.7 percent category. Even if the Detroit Customs local office doesn't accept our argument, we still have a chance to win at a higher level by asking for a ruling.

Def.'s Reply 9 (citing Hr'g Tr. 110; Hr'g Ex. H24). However, Optrex never sought a ruling from Customs.

Other evidence may, accordingly, contradict that indicia of compliance. Thus, in this case, there is evidence that at least some entries at issue were classified contrary to the legal advice given. *See* Hr'g Exs. H1, H2, H24 (supporting government's claim that attorney's advice was express in that certain LCD panels were classifiable only under heading 9013, HTSUS).

> *2. Optrex's Argument That It Cooperated with Customs*

Optrex argues that it exercised reasonable care by cooperating with Customs. The record shows that Customs's officials interviewed three Optrex employees who had knowledge relevant to the classification of imported LCDs. Optrex also claims that it gave Customs full access to its files, allowing Customs to review the company's product catalogs, part number keys, and spreadsheets showing the end use of the LCDs. Def.'s S.J. Mem. 16-17. For example, Optrex cites to the in-court testimony of Frank Corace, Customs' import specialist responsible for electronics in Detroit, stating that Optrex provided him with a parts catalog, which allowed him to understand what the product was and thus to classify it. Hr'g Tr. 46-47.

While there is evidence in the record supporting Optrex's claim of cooperation, the government pinpoints certain instances that weaken Optrex's claim of cooperation. For example, Ms. Banas testified that she could not remember whether she consulted with Customs concerning classification of merchandise or sought any advice, and that she never read any Customs rulings concerning the same or similar merchandise that Customs had published. Banas Dep. 27. In addition, the company maintained import accrual accounts that arguably suggest that the importer knew that certain LCD products were properly classifiable under a higher duty rate, and that it set aside an "import accrual" reflecting the duties, which would be owed in the event of the

discovery of the company's incorrect classification practices. At the same time, the court notes that Optrex's accrual account is not an unusual accounting practice, and that it had been reviewed by Optrex's auditors. *See* Hr'g T. 83-94, 95-102, 106, 108-110. The court cannot decide its significance on summary judgment.

### 3. *Informed Compliance and Shared Responsibility*

Optrex claims that Customs' own inability to consistently classify the imported LCD products shows the weakness of a penalty claim based on alleged misclassification. Optrex argues that it followed Customs's regulations and rulings as well as judicial decisions by way of informed compliance. This argument is premised on Mod Act, Pub. L. 103-182 § 623, which applied two new concepts to classification – informed compliance and shared responsibility[13] – requiring Customs to inform the trade community of its legal obligations through sharing and

---

[13] These concepts appear in the legislative history underlying the Mod Act:
The guiding principle in our discussions with the trade community is that of "shared responsibility". Customs must do a better job of informing the trade community of how Customs does business; and the trade community must do a better job to assure compliance with U.S. trade rules.
. . . .
As a general statement, Customs supports the JIG concept of "informed compliance." Importers have the right to be informed about Customs rules and regulations, and its interpretive rulings and directives, and to expect certainty that the ground rules would not be unilaterally changed by Customs without the proper notice and an opportunity to respond.

Customs Modernization and Informed Compliance Act: Hearing on H.R. 3935 Before the House Comm. on Ways and Means, Subcomm. on Trade, 102d Cong. 91 (1992) (statement of Commissioner Carol Hallett, United States Customs Service); *see also* S. Rep. No. 103-189 at 64 (1993) ("Title VI also implements the concept of 'informed compliance,' which is premised on the belief that importers have a right to be informed about customs rules and regulations, as well as interpretive rulings, and to expect certainty that the Customs Service will not unilaterally change the rules without providing importers proper notice and opportunity for comment.").

communication of information. Optrex maintains that informed compliance "requires clear, consistent, well-reasoned publications and guidance from Customs," which Customs failed to provide. Def.'s S.J. Mem. 21. Specifically, Customs failed to respond to the November 1999 letter, and therefore "it was remiss in its duties of 'shared responsibility' and 'informed compliance.'" Def.s S.J. Mem. 19. Most critically, Optrex claims that Customs has remained confused as to the proper classification of the subject LCDs throughout administrative and judicial proceedings. For instance, Customs first alleged that certain graphic module LCDs were improperly classified under HTSUS heading 8531, but in its third complaint, Customs dropped its allegations of misclassification regarding the graphic module LCDs, "implicitly announc[ing] that each and every graphic module that it removed has actually been properly classified by Optrex." Def.'s S.J. Mem. 25.

The government explains that none of the "inconsistent" rulings Optrex cites involve merchandise subject to this action. It maintains that Optrex purposefully sidesteps the following facts: (1) Customs gave Optrex specific guidance in 1995, Hr'g Ex. H-24; (2) Optrex's attorney advised Optrex to classify its LCD panels under heading 9013, Hr'g Exs. H-24, H-1; (3) Optrex's attorney reiterated its advice that Optrex classify its LCD panels under HTSUS heading 9013, after issuance of the *Sharp* decision in 1997, Hr'g Ex. 1; and (4) Optrex's attorney again reiterated his advice that Optrex classify LCD panels under HTSUS Ch. 9013, in February 1999, less than two months before Optrex learned that it was under investigation, Ex. H-2. Pl.'s Resp. 23.

The government's argument has significant support in the record. Precisely because the

classification of LCD products was such a complex area, Optrex should have sought a ruling

from Customs if it desired certainty. In addition, the decision tree was formulated after the

entries at issue had already been filed. It is questionable whether the November 1999 letter was

written to seek Customs' guidance. As far as the parties' arguments with respect to compliance

and shared responsibility are intertwined with their factual disagreements, the court cannot

decide at this stage whether Optrex's actions were compliant.

### 4. Optrex's Argument of Professional Disagreement

In a related argument, Optrex maintains that *professional disagreement* about the

classification of merchandise is not a breach of reasonable care. In support, Optrex argues that

Customs published rulings regarding LCD classification that were "incomprehensible." Def.'s

S.J. Mem. 23-24. "The professional disagreement between the parties appears to be rooted in the

final application of the process to the subject LCD's [sic]." Def.'s S.J. Mem. 22. In defense,

Optrex argues that it entered the subject merchandise under Heading 8531, HTSUS, with the

knowledge that Customs had reviewed documents and samples, using an experienced customs

broker and providing commercially acceptable invoices.

The government raises certain factual issues as to Optrex's conclusion that there was a

professional disagreement concerning the appropriate classification of LCD products at issue by

emphasizing that Customs changed its classification with respect to LCD modules and not with

respect to LCD panels.[14] The government underscores that the classification of *LCD panels* is

not a contentious area because Customs has consistently held that LCD panels are classifiable

---

[14] The government obliquely referred to a small number of LCD character modules capable of displaying more than 80 characters as being involved in this case. *See* Pl.'s Resp. 24.

under heading 9013, HTSUS. Optrex's position is also undermined by the testimony of Ms.

Banas, who stated that with respect to some LCD products, the company ignored and did not

abide by the Customs ruling or Customs interpretation of the correct tariff heading. Banas Dep.

30:10-13; 31:11-25, 32:9-17.

 *5. Optrex's Argument that It Followed Its "Decision Tree" Policy*

Optrex maintains that its classification of merchandise under heading 8531 is reasonable

because the imported LCDs are *prima facie* classifiable under headings 8471, 8531 and 9013.

Def.'s S.J. Mem. 13 (citing 19 C.F.R. Pt. 171, App. B(C)(1)). It represents that the decision tree

does not contravene Customs law because it incorporates judicial precedent, Customs Rulings,

the Explanatory Notes, Optrex's in-house technical experts (specifically, Optrex's Director of

Engineering Allen Houck). The decision tree's classification process is also consistent with the

pre-1997 classification advice it received from Customs counsel. In addition, the process

outlined in Customs'2001 Informed Compliance Publication regarding the classification of flat

panel displays "closely follow[ed] Optrex's classification process as outlined in the 1999 letter to

Customs." Def's S.J. Mem. 21.

Even if the court accepts Optrex's claim that the decision tree reasonably reflected

Customs law at the time, there is no testimony before the court by Optrex's employees, past or

present, that demonstrates that Optrex actually followed the procedures outlined in the decision

tree. While Optrex suggests that Optrex employees Dee Tolbert, Michele Marsh, and Allen

Houck corroborated that Optrex followed the "decision tree," other evidence contradicts this

assertion. *See* Ratermann Decl. Ex. 8 (stating that Ms. Tolbert did not became responsible for

classification matters until June or July of 1999); Marsh Dep. 25:15-24 (stating that as account manager at relevant times, Marsh had no responsibilities relating to classification of merchandise); Ratermann Decl. Ex. 5 (stating that Mr. Houck, as an engineer, was not involved in final classification of products); Houck Dep. 14:5-11 (testifying that Houck had no involvement in the creation of the "decision tree."). The government also presented contradictory evidence regarding Optrex's assertion that Mike Manese, Optrex's deceased employee, was involved in the company's classification decision. *See* Banas Dep. 19:25-20:4 (testifying that Mr. Manese had no responsibility over classification of merchandise). Finally, it is problematic that the decision tree was formulated after the entries of the subject merchandise were made, and that counsel informed Optrex that "the 'decision tree' was intended to satisfy both Customs and Optrex in the pursuit of proper classification." Hr'g Ex. H3. This evidence vitiates Optrex's assertion that the company followed the decision tree.

### III. CONCLUSION

The court's independent review of the record establishes that Optrex failed to demonstrate that there are no genuine issues as to any material fact for summary judgment to be granted at this time.

Accordingly, it is hereby

**ORDERED** that Defendant's motion for summary judgment is **DENIED**.


May 17, 2006                                             /s/ Judith M. Barzilay
_____        _____
New York, NY                                            Judith M. Barzilay, Judge